IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR3080 |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS NEAL WRIGHT, | ) | REPORT, RECOMMENDATION, |
| | ) | AND ORDER |
| Defendant. | ) | |
| | ) | |

The defendant has moved to suppress physical evidence
obtained as a result of a June 2, 2005 traffic stop and
subsequent search of his vehicle.  Filing 19.  He claims:

- The traffic stop was illegal;

- The defendant was unlawfully detained following the
  traffic stop; and

- The vehicle search was conducted without consent.

The defendant further claims that any statements made to law
enforcement officers were derived from the unlawful search,
seizure and arrest of the defendant, and therefore are
inadmissible under the Fourth Amendment.[1]

An evidentiary hearing was held on October 28, 2005 and
November 1, 2005, and additional evidence was received on
December 27, 2005.  The parties filed post-hearing briefs, and
the case is now fully submitted.  Based on the evidence, I
conclude the motion to suppress should be denied.

---

[1]The defendant's motion also requests suppression of
evidence and statements obtained in violation of the defendant's
rights under the Fifth and Sixth Amendments, but his briefs
address only alleged Fourth Amendment violations.  Accordingly,
any claim for suppression based on either the Fifth or Sixth
Amendment is deemed abandoned.

FACTUAL FINDINGS

On June 2, 2005 Nebraska State Patrol Troopers Bradley Hand
and Jason Probasco conducted a selective enforcement operation at
the Phillips interchange of Interstate 80 in Hamilton County,
Nebraska.  Troopers Hand and Probasco are experienced road
troopers who have both been certified by the Nebraska Law
Enforcement Training Center.

The Phillips interchange is located at mile marker 318.
Exit 314, the exit for South Locust Street, Grand Island,
Nebraska, is the first exit west of the Phillips interchange.
Exit 312 provides direct access to Highway 281, and several gas
stations, motels, and eating establishments are located at this
exit.  A rest area is located at marker 315 for eastbound
interstate traffic.

Interstate 80 near the Phillips interchange has two
eastbound lanes.  The Phillips interchange has an eastbound exit
ramp that accesses County Road B, a north/south roadway which
crosses the interstate.  A stop sign is located at the junction
of the eastbound exit ramp and County Road B.  To the north,
County Road B is also Nebraska Highway 2, which joins with the
interstate at this location; to the south, County Road B becomes
gravel-surfaced approximately 200 yards south of the interstate
and near the access road for a KOA Campground on the east side of
County Road B.  A residence is located on the west side of County
Road B south of the interstate.  The town of Phillips is
approximately four miles north and six miles east of the
interchange.  Other than the KOA campground, there are no
businesses or signs for businesses at or near the Phillips
interchange.

2

At approximately 5:30 p.m. on June 2, 2005, Troopers Hand
and Probasco set up a ruse checkpoint at the Phillips
interchange.  NSP has no written procedure and offers primarily
on-the-job training for setting up ruse checkpoints, but both
officers had conducted or assisted with several ruse checkpoint
operations in the past.  In this case Trooper Hand posted two
signs west of the eastbound exit ramp; the first sign, located
approximately 600 feet from the exit, stated "Drug Dog in Use,"
and the second sign, located approximately 200 feet from the
exit, stated "State Patrol Checkpoint Ahead."  These signs,
placed on the driving lane side of the interstate, were
approximately 32-by-32 inches in size and had three-inch
lettering.  Adjacent to each sign was a two-and-a-half foot tall
orange traffic cone and an 18-inch square red flag.  See exhibit
101 (Scott videotape) at 17:02.  Trooper Probasco's patrol
vehicle was parked at the underpass of the interchange with its
overhead and strobe lights activated.

Troopers Probasco and Hand exited the interstate in Trooper
Hand's patrol vehicle and parked near an abandoned gas station
located south of the interstate and east of County Road B.  The
patrol vehicle was parked on the northeast side of the abandoned
gas station, facing northwest, with the front half of the vehicle
visible to those exiting on the eastbound exit ramp.  The
officers' location was approximately seventy-five yards from the
stop sign at the end of the eastbound exit ramp.

From their position within the patrol vehicle, the officers
watched as motorists exited the interstate.  Trooper Probasco
watched with his naked eye, while Trooper Hand used binoculars to
look for out-of-state licence plates, and to see whether the

exiting motorists appeared to be looking toward the interstate in
search of a checkpoint.

At approximately 6:00 p.m. the troopers observed a 2002 gold
Dodge Ram diesel pickup approach the eastbound exit ramp stop
sign.  The officers testified that the vehicle slowed, but it did
not completely stop at the stop sign before turning south on
County Road B.  With his binoculars, Trooper Hand also noticed
the vehicle had Nevada license plates.

The defendant argues the troopers' testimony concerning
defendant's failure to stop at the stop sign is not credible, in
part because the officers also claim the defendant signaled a
right-hand turn by activating the vehicle's blinker, but the
right-side blinker of the pickup was not functional at the time
of this traffic stop.  In support of defendant's claim, Craig
Sutton testified that the right turn signal on the pickup was
broken before June 2, 2005, was not repaired, and is still not
working.  He claims the signal was broken when an employee was
backing up the pickup and the attached trailer jackknifed into
the vehicle's right-hand bumper and taillight area.  I do not
find the testimony of Mr. Sutton credible.  Mr. Sutton is
employed by the defendant to perform, among other things,
maintenance on vehicles used in the defendant's business, Wright
Angle Sets and Staging.  Mr. Sutton will therefore likely become
unemployed should the defendant be convicted.  Moreover, if the
right blinker on the pickup remains non-functional to date,
physical or testimonial evidence to that effect, and explaining
the reason the blinker is not functioning and perhaps when that
problem began, should have been available from an unbiased
source.

4

I therefore conclude the defendant failed to stop at the
stop sign before turning south on County Road B.  After turning
south, the pickup passed the KOA campground and the first county
road intersection south of the interstate.  The pickup began to
slow down near a farmstead about a half mile south of the KOA
Campground.  The officers found it very unusual that a Nevada
vehicle would exit the interstate at this location and not
enter the KOA Campground.  Trooper Hand activated his lights and
initiated a traffic stop.

When working together at a ruse checkpoint operation,
Troopers Hand and Probasco alternated contacting stopped
motorists.  When they witnessed the gold Dodge Ram pickup failing
to stop at the stop sign, it was Trooper Probasco's turn to
contact the driver of the pickup.  Since the officers were using
Trooper Hand's patrol vehicle to initiate the stop, and his body
microphone was set to the frequency of the in-car camera, Trooper
Hand accompanied Trooper Probasco to the vehicle to record the
contact between Trooper Probasco and the defendant.  However, the
combined effect of the pickup's loud diesel engine, loud radio,
and the distance between Trooper Hand's microphone and the
conversation with the defendant rendered the initial contact with
the defendant at the vehicle almost entirely inaudible on the
videotape of this stop.  See exhibit 1.

Trooper Probasco advised the defendant that his pickup was
stopped for failing to stop at the stop sign.  The officer asked
the defendant to produce his driver's license and vehicle
registration.  The defendant handed the officer his Nevada
driver's license which identified him as Thomas Neal Wright, a
fifty-five year old male who resided in Las Vegas.  The defendant
began searching the glove compartment of the vehicle for the

registration.  As he did so, both officers noted the defendant's
hands were shaking "extremely bad."  Trooper Probasco also noted
that the defendant's voice quivered as if he were very nervous.
The officer asked the defendant why he exited the interstate at
this location, and the defendant explained he was very tired and
was looking for a place to rest.  Trooper Probasco asked why the
defendant did not stop at the KOA Campground, and the defendant
responded that he did not have any camping equipment and saw no
buildings.  Trooper Probasco stated that the registration need
not be found and could be confirmed by radio instead, but the
defendant kept looking through the papers in the glove
compartment.  As the defendant continued to search for the
vehicle registration, the officer repeated that the registration
could be checked by radio and asked the defendant to come back to
the patrol vehicle so the officer could complete a warning ticket
for the stop sign violation.

     The officers observed the defendant's pickup bed and noticed
some heavy equipment and a rolled up carpet, all of which was
wrapped in plastic.  As the defendant was walking toward the
patrol vehicle, Trooper Hand asked about the contents of the
pickup bed.  The defendant responded that the equipment was stage
equipment for a show he was setting up at the Holiday Inn Express
near the Mall of America.

     Trooper Probasco sat in the patrol vehicle with the
defendant, who was located in passenger front seat.  Trooper Hand
stood outside the vehicle.  Trooper Probasco contacted dispatch
to check the defendant's driver's license and criminal history,
and the vehicle's registration.  Dispatch later advised that the
defendant's driver's license was valid, the vehicle was
registered to the defendant, and the defendant had a criminal

6

history of burglary, but was not the subject of any outstanding warrant.

   While seated in the patrol vehicle, Trooper Probasco again asked the defendant about the equipment in the pickup bed.[2]  The defendant stated he was coming from Las Vegas and heading to Minneapolis to the Mall of America to set up a stage for a show. When asked why he exited onto County Road B, the defendant stated he was looking for a place to pull off, park, and sleep, and though he was hoping to stop in Omaha to rest, he was extremely tired and needed to stop now.  The defendant did not appear to be under the influence of drugs or alcohol.

   Based on what he had learned thus far, Trooper Probasco suspected the defendant was transporting contraband.  The defendant had Nevada license plates, did not claim to be looking for a local address, and had exited the interstate at a location with no businesses; the defendant chose to exit the interstate at a location where "drug checkpoint" signs had been placed; his stated reason for doing so was to get some rest, but no gas station, hotel, or other type of business, and no signs advertising such businesses were located at the Phillips interchange, and within the last ten miles, the defendant had passed two Grand Island exits (one of which had several motels) an interstate rest area, and the KOA Campground on County Road B; the amount and type of equipment in the pickup bed (a stage, a podium, and some carpet) was minimal and similar to the type most hotels have on hand, and it seemed quite unlikely anyone would

_____

   [2]The in-car microphone was located in or directed toward the back seat area, making the conversation between the officer and the defendant within the patrol car very muffled and impossible to hear on the videotape.

hire someone to deliver this equipment from Las Vegas to a
Minnesota motel; the defendant's shaking hands and quivering
voice indicated he was very nervous; the defendant was traveling
from a high drug source state to Minneapolis, a known hub for
drug distribution; and the defendant had a criminal history.

At approximately 6:12 p.m., Trooper Probasco advised Trooper
Hand to call for a canine.  Since no NSP canines were on duty
that day, the Hall County canine handler, Deputy Sheriff Andrew
Fairbanks, was contacted.  At the time of this call, Deputy
Sheriff Fairbanks and his canine partner, Bo, were located more
than twelve miles from the site of this traffic stop.  See
exhibit 103.  Trooper Probasco had not yet asked the defendant
for consent to search the pickup, but wanted a dog handler to be
en route to the area to expedite a canine sniff if the defendant
refused consent.  Trooper Hand, who remained outside the vehicle
and had not heard or participated in the discussion between
Trooper Probasco and the defendant, responded to Trooper
Probasco's request, called for a drug dog, and stated the dog was
needed because the stopped motorist had denied consent.

While Trooper Probasco continued to complete the warning
ticket, he asked the defendant if there was contraband in the
vehicle.  The defendant denied having any type of drugs,
specifically marijuana, or any kind of a pipe or drug
paraphernalia.  The officer explained the criminal activities
often discovered by law enforcement through the use of ruse
checkpoints.  In response to the Trooper Probasco's questioning,
the defendant stated he never saw the checkpoint signs posted on
the interstate.

Trooper Probasco completed and handed the defendant a
warning card, and returned his driver's license.  The defendant
exited the patrol vehicle and started walking toward his pickup.
Troopers Probasco and Hand stood at the left front of the patrol
car.  When the defendant reached the left rear corner of his
pickup, Trooper Probasco asked the defendant if he could ask a
few questions.  The defendant said, "Yes."  Trooper Probasco
again inquired as whether the defendant had any type of
contraband in your vehicle, specifically mentioning types of
drugs and stolen equipment.  The defendant denied having any type
of contraband in the vehicle.

Trooper Probasco asked, "May I search your vehicle and the
contents therein?"  The defendant said "yes" or "sure," pointed
to his pickup and said, "go ahead and search."  The defendant
then said he wanted to leave that location and find a place at
the campground to stay.  Trooper Probasco responded that if the
defendant agreed to a vehicle search, for officer safety reasons,
the officers would perform it at the roadside rather than
allowing the defendant to return to his vehicle and meet them at
another location.  The defendant now appeared unwilling to
consent and said it might be best to bring a canine.  Trooper
Probasco asked if the defendant was still consenting to a search,
and the defendant said, "No," explaining that he did not want the
officers to search the vehicle.  Trooper Probasco told the
defendant he needed to wait for the canine to arrive, and with
the defendant's consent, pat-searched the defendant for weapons.

The defendant continued to stand on the roadway.  Trooper
Hand explained to the defendant that based on the officers'
experience with checkpoints, when someone exits the interstate
rather than driving through the checkpoint, the officers suspect

9

the exiting motorist is doing something illegal.  Hand stated
that if the defendant had a marijuana pipe or a small bag of weed
in the pickup, it was an infraction in Nebraska, much like a
speeding ticket.  The defendant looked down and to his right.
Hand repeated that an infraction was basically a speeding ticket
and if the defendant had anything illegal in the pickup, it would
be simpler for all involved if he just told the officers.  The
defendant responded that he had just snorted a couple lines (of
cocaine) and there was a rolled-up dollar bill in the vehicle.
Hand asked where the rolled-up dollar bill was, and the defendant
responded that it was between the seat and the console.

    As Wright stood between the patrol vehicle and his pickup,
Hand went to the defendant's vehicle and found a rolled dollar
bill, with white residue on one end of the tube, between the
passenger seat and a duffel bag located on the passenger
floorboard.  When Hand asked the defendant if other drugs were in
the vehicle, the defendant stated he had a white bindle in the
water.  Hand went to the vehicle to look, saw a cooler in the
vehicle, and asked the defendant if the white bindle was in the
cooler.  The defendant said, "Yes."  Trooper Hand retrieved the
white square bindle from the cooler.

    Trooper Probasco patted the defendant down for officer
safety, placed him in the patrol car, and began to write a
citation for possession of drug paraphernalia.  Trooper Hand
contacted he dog handler who was en route and, intending to
advise him not to come to the scene, stated the defendant had
consented and had admitted to possession of paraphernalia.  See
exhibit 103.  However, the dog handler continued to the scene,
and when deployed, the dog indicated the presence of illegal
drugs on the rear passenger side of the vehicle.  Ex. 103.

10

Trooper Hand, along with Trooper Scott who had now arrived at the scene, began searching the vehicle.  Inside the duffel bag on the passenger side floor they found a six-by-ten-by-two inch brick of what appeared to be illegal drugs.  Trooper Scott placed the brick on the hood of the patrol car.

The defendant was placed under arrest but was not advised of his <u>Miranda</u> rights.  While Trooper Probasco remained seated in the patrol vehicle with the defendant, Troopers Hand and Scott continued the vehicle search and found a black suitcase in the rear seat area.  As Trooper Hand was carrying the suitcase to the back of the pickup, the defendant told Trooper Probasco, "They found the rest of it.  That thing's full of cocaine."  This statement was not made in response to any question or statement of any officer.


LEGAL ANALYSIS

The defendant claims the officers lacked probable cause to stop his vehicle because no traffic violation occurred, and that the traffic stop was simply a pretext to search the pickup because the officers believed a Nevada vehicle exiting the interstate where drug checkpoint signs were posted was likely transporting drugs.  He further claims he was unlawfully detained during the course of this stop, did not consent to the warrantless search of his vehicle, and the search therefore violated the Fourth Amendment.  He therefore argues that the drugs found within his pickup and any statements made thereafter must be suppressed as the fruits of the illegal traffic stop, detention, and search.

Even a minor traffic violation provides probable cause for a traffic stop.  An officer's subjective belief that illegal drugs may also be present in the vehicle does not invalidate the stop. A traffic stop is not rendered invalid by the fact that it was a "mere pretext for a narcotics search."  United States  v. Williams, 429 F.3d 767, 771 (8th Cir. 2005)(citing Whren v. United States, 517 U.S. 806, 812-13 (1996); United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004); United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004)).

The defendant violated Neb. Rev. Stat. § 60-6,148 by failing to stop for at a stop sign.  Even assuming the officers believed the defendant was transporting illegal drugs, and that their primary motivation was to stop a vehicle with Nevada license plates exiting the interstate in response to drug checkpoint signs, the troopers did not violate the defendant's Fourth Amendment rights when they stopped a vehicle for violating Nebraska law.  "Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred."  United States v. Long, 320 F.3d 795, 798 (8th Cir. 2003). Troopers Hand and Probasco probably pursued defendant's traffic violation because they suspected drug trafficking.  However, "a law enforcement officer's ulterior motives in initiating contact with an individual (or his pursuit of the more general programmatic purposes of the operation) are irrelevant to the Fourth Amendment question when probable cause . . . exists." United States v. Williams, 359 F.3d 1019, 1021 (8th Cir. 2004). See also United States v. Martinez, 358 F.3d 1005, 1008 (8th cir. 2004).

The defendant claims he was unlawfully detained and subjected to questioning following the traffic stop.  He argues that even if the traffic stop was valid, the troopers unlawfully extended it beyond the scope of writing a warning ticket for failing to stop at a stop sign.

After stopping a vehicle, an officer can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip.  <u>Long</u>, 320 F.3d 795; <u>United States. v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994)(citing <u>United States v. Barahona</u>, 990 F.2d 412, 416 (8th Cir. 1993); <u>United States v. Richards</u>, 967 F.2d 1189, 1192-93 (8th Cir. 1992)).  The officer may detain a vehicle occupant while performing the routine tasks of writing a citation, and completing computerized checks of a driver's license, vehicle registration, and the criminal histories of vehicle occupants.  <u>United States v. Fuse</u>, 391 F.3d 924, 927 (8th Cir. 2004); <u>United States v. White</u>, 81 F.3d 775 (8th Cir. 1996).

I conclude that the initial questioning of the defendant during this traffic stop was reasonable.  The officers asked for his driver's license and registration, and asked about the origin and destination of his trip.  As to the purpose of his trip, the officers asked what he was hauling in the pickup bed, why he was traveling to the Minneapolis area, and why he diverted from that route by exiting the interstate at the Phillips interchange and turning south.

Based on the defendant's answers, and the officers' knowledge, experience, and observations, within the first five minutes of this traffic stop, the troopers suspected he was

13

engaged in illegal drug activity.  They noticed the defendant was
very nervous; was traveling from a drug source state to a drug
distribution hub; claimed to be making a cross-country delivery
of equipment to a motel, but the equipment in the pickup was
minimal in amount and of a type ordinarily kept on hand at motels
or, at very least, available locally; claimed to be exiting the
interstate to get some rest but within the last ten miles, had
passed exits with motels, an interstate rest area, and a
campground; and had exited the interstate at a location with
posted drug checkpoint signs but no actual or advertised
businesses except for the campground.  Although each of these
factors alone "is susceptible of innocent explanation, and some
factors are more probative than others," a "determination that
reasonable suspicion exists . . . need not rule out the
possibility of innocent conduct."  United States v. Arvizu, 534
U.S. 266, 277 (2002).

I conclude that, considered in the totality, the facts of
this case establish that Troopers Hand and Probasco reasonably
suspected the defendant was involved in criminal drug activity.
see e.g. United States v. Blaylock, 421 F.3d 758, 769 (8th Cir.
2005)(finding reasonable suspicion where upon initial contact,
passenger did not make eye contact with the officer; stated
purpose of the trip was implausible; driver consented to a search
but the passenger refused consent and changed his reason for
doing so; and the passenger was fidgeting and squirming, and his
hands were shaking, and when pointedly asked if there were
illegal drugs in the vehicle, his eyebrow began twitching
uncontrollably and his right arm began shaking); United States v.
Fuse, 391 F.3d 924, 929 (8th Cir. 2004)(finding reasonable
suspicion where vehicle had a strong odor of air freshener; the
defendant had a criminal record; the car did not belong to its

14

occupants; the occupants were traveling from a "source state" for illegal narcotics; the explanation for the trip was unusual or implausible; the occupants were unusually nervous; and there was a mobile telephone and "NoDoz" in the car).

The defendant may be contending that Trooper Probasco violated the Fourth Amendment by asking the defendant, while seated in the patrol vehicle and before the warning ticket was completed, whether the defendant was transporting illegal drugs. When a defendant's responses to the officer's questions are inconsistent with known facts, a trooper's suspicions may be sufficiently raised to justify expanding the scope of the stop to ask additional, more intrusive, questions.  United States v. Morgan, 270 F.3d 625, 631-32 (8th Cir. 2001); United States v. Edmiston, 208 F.3d 693, 694 (8th Cir. 2000); United States. v. Ramos, 42 F.3d at 1163.  Since the officer reasonably suspected the defendant was involved in illegal drug activity, he did not violate the Fourth Amendment by asking, during the course of the traffic stop, whether there were drugs in the defendant's vehicle.

The defendant claims that once the traffic stop was complete and the defendant's papers and driver's license returned, the troopers unreasonably detained the defendant by asking him additional questions as he walked to his vehicle.  For purposes of determining whether a further detention was proper, returning the defendant's driver's license, delivering the warning citation, and allowing the defendant to exit the patrol vehicle does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop.  Fuse, 391 F.3d at 929.  Officers may continue to investigate for criminal

15

activity until their suspicions are dispelled.  Id.; Long, 320
F.3d at 798.

    In this case, Officer Probasco asked the defendant if he
would answer a few more questions, and the defendant agreed.  In
response to questioning, the defendant again denied having drugs
in his vehicle.  The officers asked for consent to search the
vehicle, which was initially granted and then denied.  Although
the defendant claims the officers unlawfully detained him
following completion of the traffic stop to ask additional
questions and for consent, "[l]aw enforcement officers do not
violate the Fourth Amendment by asking a person for consent to
search or other types of cooperation, even when they have no
reason to suspect that person, 'provided they do not induce
cooperation by coercive means.'"  United States v. Yang, 345 F.3d
650, 654 (8th Cir. 2003)(quoting United States v. Drayton, 536
U.S. 194, 201 (2002)).

    The question is whether a reasonable person in the same
circumstance would have felt free to leave.  United States v.
Morgan, 270 F.3d 625, 630 (8th Cir. 2001).  The court determines
whether an encounter constitutes an unlawful detention or seizure
on a case-by-case basis.  There is no litmus test distinguishing
a consensual encounter from a seizure, and the test, such as it
is, is "necessarily imprecise, because it is designed to assess
the coercive effect of police conduct, taken as a whole, rather
than to focus on particular details of that conduct in
isolation."  Michigan v. Chesternut, 486 U.S. 567, 573 (1988).

        Some circumstances that inform the determination of
        whether a seizure took place include:  officers
        positioning themselves in a way that limits the
        person's freedom of movement, . . . the presence of
        several officers, the display of weapons by officers,

16

> physical touching, the use of language or intonation
> indicating compliance is necessary, the officer's
> retention of the person's property, or an officer's
> indication that the person is the focus of a particular
> investigation. . . .

United States v. Johnson, 326 F.3d 1018, 1021-22 (8th Cir. 2003).
Although questions about drugs concern a sensitive topic, this
questioning does not in itself create an inherently coercive
environment.  United States v. Morgan, 270 F.3d 625, 630 (8th
Cir. 2001).

    Considering the totality of this traffic stop, including the
considerations set forth in Johnson, I conclude that a reasonable
person in the defendant's position would have felt free to say,
"No," and to continue on his way when the troopers asked if he
would answer further questions.  The defendant had received all
his property from the trooper, and was walking to the vehicle
when the question was asked.  Neither trooper physically
positioned himself to stop the defendant's return to his vehicle.
No threats or promises were made, neither officer demanded the
defendant's cooperation, and weapons were never drawn.  The
defendant is an English-speaking adult who did not appear to be
under the influence of drugs or alcohol.  Though the defendant
was never told he could leave and refuse to answer questions,
that fact does not establish that his conversation with the
troopers was nonconsensual.  United States v. Santos-Garcia, 313
F.3d 1073, 1078 (8th Cir. 2002)(citing Morgan, 270 F.3d at 630.
Moreover, the defendant was walking to his vehicle, and
apparently believed he was free to leave.  Morgan, 270 F.3d at
630.  Taking into account all the circumstances of this
encounter, a reasonable person would have believed he was free to
"ignore the police presence and go about his business." Michigan
v. Chesternut, 486 U.S. 567, 569 (1988)). See Morgan, 270 F.3d

17

at 630 (holding that after the warning ticket was issued, and all
property was returned to the driver, initiating a conversation
with the driver on the roadway about drug interdiction was not an
impermissible detention even though the driver had not been told
she could leave and stated she did not subjectively feel free to
leave).

    This finding is reinforced by the defendant's response when
asked for consent to search the vehicle.  Though the defendant
initially consented, when told he could not drive his vehicle
from the scene of the stop until the search was complete, he
revoked the consent.  He was then told he would be detained until
a drug dog arrived, and in response stated he would wait for the
drug dog.  There is no evidence the defendant's will was
overborne by any police-dominated atmosphere.

    Moreover, even if the further detention was a seizure, there
was a reasonable articulable suspicion to justify it, so long as
the length of detention was not unreasonable.  See e.g. United
States v. White, 42 F.3d 457, 460 (8th Cir. 1994)(finding delay
of one hour and twenty minutes for arrival of drug dog
reasonable); Bloomfield, 40 F.3d at 916-17 (one hour wait from
time of stop to arrest, part of which was waiting for a drug dog,
was reasonable).

    While awaiting arrival of the drug dog, Trooper Hand engaged
the defendant in further conversation, advising him that
possession of small quantities of drugs or drug paraphernalia is
only an infraction in Nebraska and if the defendant had such
items, everyone would be better off if he just admitted that.
The defendant responded by stating he had snorted cocaine through
a rolled dollar while in the vehicle and that he possessed a

18

white bindle.  When the defendant made these statements, he knew
he was not free to leave and he had not been advised of his
Miranda rights, but he was neither physically restrained by the
officers nor in custody.[3]  The defendant was not coerced by
promises, threats, or weapons to speak with the officers, the
officers did not demand his cooperation, and the encounter
occurred on an open public roadway adjacent to a farmstead.  I
conclude that the defendant was not coerced to speak with the
officers in violation of his Fourth Amendment rights.

Once the defendant admitted to using cocaine in the vehicle
and possessing drug paraphernalia, the officers had probable
cause to search the vehicle.  United States v. Caves, 890 F.2d
87, 90 (8th Cir. 1989)(Officers had probable cause to search an
automobile for unused marijuana where the driver's person and
breath smelled like burnt marijuana).  "The warrantless search of
a vehicle is constitutional pursuant to the 'automobile
exception' to the warrant requirement, if law enforcement had
probable cause to believe the vehicle contained contraband or
other evidence of a crime before the search began."  United
States v. Castaneda, Doc. No. 05-1010 (8th Cir. February 24,
2006)(quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir.
2003)).  Accordingly, the nonconsensual search of the defendant's
pickup did not violate the Fourth Amendment because the officers

---

[3]"No Miranda warning is necessary for persons detained for a
Terry stop. . . .  Thus, we reject as contrary to this
controlling authority [the] broad contention that a person is in
custody for Miranda purposes whenever a reasonable person would
not feel free to leave.  One is not free to leave a Terry stop
until the completion of a reasonably brief investigation, which
may include limited questioning.  But most Terry stops do not
trigger the detainee's Miranda rights."  United States v.
Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)(internal
citations omitted).

19

had probable cause to conduct a warrantless search of the
vehicle.

Finally, discovering the evidence in the pickup was
inevitable.  Under the inevitable discovery doctrine, evidence
that would have been discovered "through independent, lawful
means should be admitted so that the prosecutor is put in the
same, not worse, position as though the original illegality had
not occurred."  United States v. Madrid, 152 F.3d 1034, 1037-38
(8th Cir. 1998)(citing Nix v. Williams, 467 U.S. 431, 442-43
(1984)).  In evaluating the evidence, the focus is on what the
officers would likely have done had the unlawful search not
occurred.  The government must prove by a preponderance of the
evidence: (1) that there was a reasonable probability that the
evidence would have been discovered by lawful means in the
absence of police misconduct, and (2) that the government was
actively pursuing a substantial, alternative line of
investigation at the time of the constitutional violation.
United States v. Villalba-Alvarado, 345 F.3d 1007, 1019-20 (8th
Cir. 2003).

Deputy Sheriff Fairbanks and his canine partner, Bo, were
summoned to the scene only twelve minutes after the defendant's
vehicle was stopped.  In requesting canine assistance when he
reasonably suspected criminal activity, Trooper Probasco was
clearly pursuing an independent and legal means of determining
whether illegal drugs were present in the pickup bed.  Had
Troopers Hand and Probasco said nothing more to the defendant
once the traffic stop was complete, they could have lawfully
detained the defendant until the arrival of the drug dog which
was already en route.  Fuse, 391 F.3d at 929 (holding that the
Fourth Amendment was not violated where reasonable suspicion

20

existed, the defendant refused consent to search his vehicle, and the defendant was detained until a drug dog arrived).  When the drug dog arrived, he alerted several times on the pickup and indicated on the rear passenger side of the vehicle, where the suitcase of cocaine was found.  Accordingly, despite the defendant's claim that he was unreasonably detained and questioned in violation of his Fourth Amendment rights, the evidence of cocaine located in the pickup bed should not be suppressed because it would have inevitably been discovered following the canine's indication.  See <u>Hammons</u>, 152 F.3d at 1030 (assuming the defendant did not voluntarily consent to the officer opening an envelope located in the garment bag found in his vehicle trunk, the cocaine therein would have been inevitably discovered had a drug dog been called to the scene).

    IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, Chief United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), that the defendant's motion to suppress, filing 19, be denied.

    The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

    IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on April 17, 2006 for a duration of three trial days before the Honorable Richard G. Kopf.  Jury selection will be at the commencement of trial.

    DATED this 27th day of February, 2006.

                              BY THE COURT:

                              s/ *David L. Piester*
                              David L. Piester
                              United States Magistrate Judge

21